Good morning and may it please the court. Anna Katselis for the United States. I would like to reserve four minutes for rebuttal. You see that little clock in front of you? Yes. Okay, when it gets to four minutes, you've got to stop talking. Thank you, Judge Kaczynski. This case concerns a 1995 settlement agreement entered into by the Department of Energy, the State of Idaho, and the Navy concerning the I-Neil. Among other areas at the I-Neil are an 88-acre subsurface disposal area where waste generated and received prior to 1970 was buried and a transuranic storage area where, as of 1995, approximately 65,000 cubic meters of waste were retrievably stored above ground. The issue... It says that in the agreement, does it? It does not. It doesn't say retrievably stored. It doesn't say above ground. It doesn't say below ground. It doesn't say anything else. No, but it does say approximately... This was negotiated by. This was... Negotiated by a bunch of kindergarten kids? It was not, Your Honor. It was negotiated by high-level people. OSMA? People who went to law school? Yes. And they know that this is going on there? They realize there's above-ground stuff and below-the-ground stuff? And there's negotiations about, according to the United States, about whether to be included or not? And nobody wants to say, yes, it is included, no, it's not included? Well, they did restrictively modify by saying by estimating the amount of waste that they were referring to. And the context of the situation, what's very important, is that all that the parties had in their contemplation was the stored waste. It was well known by all the parties... Why would you put in some kind of an estimate that doesn't even estimate anything? As opposed to saying, all transuranic waste now located at INEL above ground. It's regret... I'm saying if that's what they meant. Right. Your Honor, we acknowledge that the language is regretful. We wish it were more clear, but... I'm saying that all 65,000 cubic meters come within the definition that are above ground, come within the definition of transuranic waste, and every bit of that has to be shipped under this agreement? All... DOE's position is that all the waste in the transuranic storage area, which is approximately 65,000 cubic meters of waste, it is their obligation to ship that out of the state of Idaho by 2018. Now we... The definition of transuranic waste covers all of that. The definition... As defined, what is it, 100 microcarriers, something like that? It's defined in the EIS, Your Honor, as that with a concentration of transuranic isotopes of greater than 100 nanocuries per mole or gram per gram. Now that does not... That definition changed in 1982. Prior to that, it was above 10 nanocuries per gram. And in the stored area, it has a combination. The stored area is above 10 nanocuries per gram. So it's within the old definition. You have to use the old definition. You do. Is that what this agreement uses, is the old definition? The agreement uses the new... It incorporates the new definition. The new definition, but when you said transuranic waste, you really meant the old definition. Yes, Your Honor. That's another thing that is not clear, regrettably, from the contract language, but... Well, I thought the contract language referred us to the 100 nanocuries. Am I wrong? The contract language does not... It references the definition from the EIS. Yes, and the EIS says... Above 100. That's what I said. I thought the contract... References that. I thought the contract used the definition from the EIS. It does, Your Honor. You're correct. It does. But that's not what the contract means either. It doesn't mean that definition. It means some different definition. Am I correct? That's what you're saying? That is... I understand your position. Thank you. You're welcome. Now, we understand the language is not as clear as it can be. It's difficult language. DOA acknowledges that. But the intent of contract interpretation is to affect the mutual intention of the parties. Here, there can be no question that what the parties were referring to was the stored transuranic waste. The buried waste is governed by... Yesterday, there was a doubt. I wasn't there. Were you there? I was not there, Your Honor. However... How do I know? First, first point. In 1991, EPA, the State, and DOE entered into a separate contract governing the buried waste, agreed to deal with that waste pursuant to CERCLA. In paragraph G1 of the 1995 settlement agreement, they expressly agreed to continue to implement that agreement, the Federal Facilities Agreement, without any modification. Now, under the Federal Facilities Agreement governed by CERCLA, the parties are currently studying remedial alternatives for the buried waste. Now, why would they preserve that if they had intended to include the buried waste in the 1995 settlement agreement? It makes no sense. Have you ever heard of belt and suspenders? If I had tons and tons and tons, cubic metric tons of radioactive waste in my backyard, I would try to cover it every which way, try to make as many deals as possible to make sure that thing is out of there. Well, they have. There's no inconsistency between the two. There is an inconsistency, Your Honor. Okay. What's the inconsistency? The inconsistency is, under CERCLA, the parties go through a process whereby they study. They first do a remedial investigation to detect and analyze the extent and nature of the contamination. Then they study remedial alternatives consistent with CERCLA's requirements, and then collectively the parties choose a remedy. Now, if all three parties can't agree, Your Honor, the final remedial selection decision is the decision of the Environmental Protection Agency. There is a potential conflict here because that decision. So you've got your remedy there, and then you say, okay, EPA says it's okay to bury it further, you know, to take these other remedial measures. Well, we've got this other agreement. This is the United States has to take it out. So this doesn't work. We're going to rely on this other thing. There's no inconsistency. Well, hypothetically, Your Honor. The United States always can take it out, right? No. That's not correct. Perhaps the best remedy and the safest remedy in this instance is to cap the area or to cap part of it. Now, there's a potential inconsistency there because if DOE has obligated itself to excavate the entire subsurface disposal area and EPA says no, the best remedial decision is to cap that area, there's an inconsistency. The point is that with respect to CERCLA, there are special statutory requirements that the parties agreed to follow to make that determination. This is clear in the language. They preserved that. Yes, Your Honor. If you don't dig it up and take it out, though, the worst thing that happens, you can't keep shipping stuff in, correct? That is the remedy under this. So on this agreement, if you decide you're not going to dig it out and carry it, dig it up and carry it out, then you just can't keep shipping more stuff in there. It gives the state the option to suspend shipments into INL spent nuclear fuel. Yes, Your Honor. But the point is that DOE did not commit itself to, in the 1995 settlement, excavate all the waste. Another important point here, the interpretation advocated by the state would not simply require DOE to ship waste. Now, the transuranic storage area, this is very important contextual evidence, the transuranic storage area is all above ground, it's retrievably stored in containers. This is how it's been done since 1970. Prior to that, it was disposed, it was mixed together in a subsurface area. If DOE has to ship this out, it's not a matter of shipping, and the parties use the term ship to describe what DOE has to do. They did not say that DOE must excavate everything, must sort all the waste, to isolate that within the new definition of transuranic and ship that out of the state. Also, if the parties had really intended that, it can be expected that they would have said something about what is to be done with the waste that's presumably just going to be left there on the surface after having been dug up. This language, the interpretation that the state is positing is not at all reasonable in light of these circumstances, and the Court needs to consider that, and that is the proper method of contract interpretation. Also, the estimate. If the parties really didn't know how much waste was there, why include an estimate, Your Honors? They did, and the estimate correlates only and precisely to the amount of waste in the stored transuranic area. What is the 100 nanocuries per gram standard? How much of that is above and below ground altogether? As of 1995, Your Honor, it was estimated that about half in the stored area was below the 100 nanocuries limit. There is nothing known. About 65. Right. So now you're down to about 32. Yes. Okay, and what about below the ground? There's nothing known about that. There is nothing known in 1995. There is no reliable estimate of how much is below 100 nanocuries. You might, if you're using the 100 nanocuries standard, you might estimate that above and below ground is approximately 65,000, which would include the above ground and below ground. That's over 100 nanocuries. Respectfully, Your Honor, the parties would not have just guessed. The estimate would have come from somewhere. There is a deep question. They said approximately. They did say approximately. You didn't say exactly. You didn't say we have ledgers. I mean, you knew exactly how much actual stuff that was stored there above ground. I mean, this is not something you had to approximate. This is something that you could look to the books and. . . Well, it was approximate. It was approximate. It's relevant here that there was a detailed environmental impact statement prepared prior to this. That environmental impact statement, it does incorporate the definition of transuranic waste above 100 nanocuries, but also relevantly, Volume 2 goes on to approximate the amount of transuranic in the old definition in the stored area. And it also explains, Your Honor, it explains that DOE has always continued to manage alpha-low level, which is the below 10 nanocuries, and the new definition of transuranic together as transuranic waste. That is analogous to usage of trade evidence, and it's evidence that was known by the state at the time that it entered into this contract. DOE always managed this as a transuranic waste stream. It's called a. . . If everybody really was all in agreement, it was all clear and all that, what do you think is going on now? You think the state is lying? You know, it's only six years later, right? It's a complete. . . This was negotiated in 95, and 2000. . . It's nine years later. Well, now it's nine years later. Yes. But the point where they took the position, they went to district court, was six years later. Right. I mean, everybody's still around. Right. This is not like, oh, this is 100 years ago, and we have to figure out what was negotiated. Correct. What do you think they're making it up? Their position, Your Honor, is directly contrary to their contemporaneous statements' understanding. I can't speculate about what is going on. The CERCLA process does take time. It does. . . It requires the study and the investigation. Were there any statements from their negotiators that support your view? We have submitted three statements contemporaneous with the agreement. Two people. Oh, no, no, no. No, we've submitted statements of the state indicating their. . . The extrinsic evidence that the court declined to accept, is that correct? That is correct, Judge, yes. But these statements, they erase any doubt, Your Honor, about the state's understanding at this time. The governor's office, just a month after this settlement, issued a fact sheet explaining that there were 62,000 cubic meters of stored transuranic waste. . . I'm sorry, 62,000 cubic meters of buried transuranic waste and 65,000 cubic meters of stored transuranic waste, and that this agreement required DOE to remove all the stored waste. A State of the State address, same thing, stored waste. Kathleen Trevor, who submitted an affidavit in this case, to the effect that there are 65,000 cubic meters of both stored and buried, a statement that has absolutely no factual basis. Getting back to the question from the beginning, so what happened? What happened if everybody thought this dealt with stored waste and the negotiators knew that this was an issue? It's not like this underground waste was a new problem that arose. You were aware of its existence. Right. I'm still having a difficult time figuring out how this didn't get into the agreement. Why? And why we shouldn't sort of say, well, since this was all very clear to everybody at the time, and nobody bothered putting it in, we have to, like, take the language and read it as it says, for what it says. Your Honor, we understand that it's difficult language, but the reason that the Court should not do that is because the intent is to effectuate the parties' mutual intent. That mutual intent is clear here. I thought intent was generally effectuated by reading the document and saying the intent of the parties is what's clearly expressed in the document, unless perhaps you're in California or unless it's some sort of unique situation like the kind spelled out in the UCC. I thought that's what it was. Well, first point, we think that this is not so different from a UCC case because this is a situation where DOE agreed to ship waste out of the state. In O'Neill, the issue, the agreement had to deal with delivering water. You have, I mean, the evidence here of what, how DOE has managed this waste is like usage of trade evidence. There is no question that the parties knew that this was managed as a transuranic waste stream. Also, the parties have a prior course. What I don't understand is what you're saying is if General Motors has done something internally a certain way for a long time, that becomes the standard of the trade or that becomes the normal standard. I understand that the trade business, the merchants deal, and every time the merchants in this particular business say potato, we think a thing that we think is a potato, but what they really mean is a kilo of marijuana. So then all these guys deal that way, and so that's what potato means. That's the course of the trade. I don't quite understand that if I personally in my house call marijuana potatoes, that becomes a course of trade. Here it's right. It's not exactly the same, but the definition is any practice or method of dealing, having such regularity or observance in a place, vocation or trade as to justify an expectation that will be observed with respect to the transaction in question. Here it is, there is no question that DOE always managed this as one transuranic waste stream. But who cares about it? I mean, what I'm talking about, you're saying because DOE does it a certain way, ergo that's the trade standard. Right. Why do I make that jump when? Well, because the case law does support, and I would like to try and sum up soon here because I'm cutting into my rebuttal time. The case law does support that you define it liberally to fit the facts of the situation. This is a unique case, no question. But the point is there is objective evidence. This is not subjective testimony about what the parties thought this contract meant. This is objective evidence that they agreed to deal with the buried waste separately in a separate agreement four years earlier, and that they knew that DOE manages waste this way. It's not disputable. There's no question. It's relevant contextual evidence. Thank you very much. Your Honors, my name is Darrell Early. I'm here on behalf of the State of Idaho and the Governor of the State of Idaho, Dirk Tempthorne. The State respectfully requests that the Ninth Circuit Court of Appeals affirm the decision of the District Court and hold that the plain language of the 1995 settlement agreement requires the Department of Energy to ship all transuranic waste now located at the INEL. Well, you could have made it plainer for yourself, too, by saying, you know, above and below ground. If you wanted plain, you could have done that. Don't talk plain to me. You know, if that's what you wanted, if that's what you bargained for, you said, you know, that stuff that's above ground, that's stored, that's included, and also the stuff that's buried. We didn't say that. Now, that would be plain. Your Honor, I am sure that if we spent the time... Minutes adding that language, it would have been clearer. Your Honor... If you had sort of looked at it and said, gee, you know, we're dealing with above ground stuff that's stored in barrels and things, and then we've got this stuff that's dumped in the backyard, you know, sort of buried haphazardly, and we are lawyers who went to law school, and so how can we make it clear that we really don't just mean the stuff that's over there in the barrels. We mean the stuff that's in the back in the ground. Or we'll just add a couple of sentences that say we mean the stuff above ground, the stuff below ground, from the heavens above to the ground below. You know, you could have done that. I think we did that, Your Honor. That's plain. I think we did that. What you guys did is not plain. What you guys did is obscure. Now you're picking up the pieces. Your Honor, I believe that the word all, when you use the word all, that means exactly what it says, and that encompasses the entirety. On the reference to 65,000 cubic meters, the government's pointed to something that existed at the time that attaches that number to something else. Can you point to anything that explains the source of that number that isn't the government's interpretation, that is that it refers to the above ground stored portion? Well, I think the operative language in the agreement itself says currently estimated at 65,000 cubic meters. But presumably that number wasn't plucked from midair. It's a reference to something. And what I want to know is, is there anything that you can identify that explains that number in terms of the interpretation of the contract that you're offering up? Well, Your Honor, we did offer the affidavit testimony of Kathleen Trevor. Well, I understand you offer what seemed to me to be a construct after the fact by saying, well, if it's half, it sort of works out. But I'm wondering if you can point to anything that existed at the time or at approximately that time that used the number approximately 65,000 cubic meters to refer to the waste that you're now saying the contract refers to. Your Honor, with respect to the specific number, 65,000 cubic meters, if you're going to say that there is a restrictive limitation that it only applies to 65,000 cubic meters, the only reference to 65,000 cubic meters as a defined number is the reference that the United States relies on. And isn't that an ambiguity? No, Your Honor. How else can you explain the reference to 65,000 cubic meters? I think the language of the agreement itself specifically says this was their current estimate of what the parties believed was the volume of all of the train tracks. I can't point to anything that says that was the current estimate of the parties, that being the waste above ground. Because if you can't, then I'm looking at a contract that says all Major League Baseball teams of which there are 16 in number. Well, we know there aren't 16 Major League Baseball teams. There may be 16 National League teams, but there's some dissonance here. And I think that's the dissonance that the government's trying to identify as ambiguity. What I'm hearing for you is that there's no other explanation for that number other than the one the government's offered. So the contract should be read to say shall ship all, and I give you all is a very powerful word, is the government's problem, federal government's problem, all transuranic waste now located at the laboratory, currently estimated as being the amount of the waste stored above ground. Isn't that an ambiguity? I do not see it as an ambiguity, Your Honor. Then why would the 65,000 figure be inserted? Your Honor, there is no evidence directly as to the question of why the number was inserted other than the agreement itself. If you look at paragraph B-1 and compare it to the rest of the document, paragraph B-1 in the agreement is the only part of the agreement where the parties tried to negotiate a schedule for the removal of the material. They were trying to get at how quickly can you get it out, get it to the waste isolation pilot plant, and what volume per year do you need to move in order to try and come close to that schedule. There's no other place in the agreement that's like that. So the best evidence as to why, and it's the only evidence, and it appears from the agreement itself, would be that the parties were trying to estimate what the total volume was that might possibly be out there in order to set those interim schedules and milestones. That's the only thing that we have in the record on that issue. I'm not sure how that helps you. Trevor's affidavit says that the EIS estimates 62,000 below ground, 65,000 above ground. Correct? Yes. That's accurate? Yes. I don't mean am I accurate on what she says. It's accurate. That's what the EIS estimates. Yes, and the EIS is in the record. Each of those is a mix of transuranic and alpha, whatever it is, low alpha waste, whatever it is. Right. Alpha low level waste, right? Yes, Your Honor. All right. There are two numbers that are very similar at least, 62 below and 65 above. Right. And your argument, I take it, is that, well, if you figure it's about half and half, that comes out roughly 65 again. Is that right? That is the testimony Ms. Trevor has in her affidavit, that that was the reason that they chose that number. And the origin of those two numbers is the one we just said, the EIS, right? Yes. All right. And there is other evidence in the record about sort of the uncertainty. So the idea would be that they would dig the stuff and then separate out the stuff that's below and the stuff that's above? Yes. And, Your Honor, just for purposes of clarity of the record, even the material that is above grade is buried, or at least a large chunk of it is. It's buried on a pad under an earthen berm. So there, even under the United States' theory, there's excavation that is ongoing at the site to retrieve from the bermed area this buried material. When it says located at NL, I mean, what exactly is the layout of the thing? I should understand this is a facility, right? Yes, Your Honor. It's a lab. Yes. And I understand the things that are within the facility are at the facility. Where is the stuff in the back? Is it like a back? How connected is it to the facility itself that that's below? I don't think we have anything that I can point you to in the record that gives you a description of the facility, Your Honor. Off the record, I can tell you that the INEL is, I believe, around 900 square miles in size. It consists of about five or six different major components, laboratory components. The main focus of this is on a facility referred to as the radioactive waste management complex, which is where a large portion of the radioactive waste is managed, and where the subsurface disposal area, which is one portion of the RWMC, not to bore you with acronyms, but where the subsurface disposal area is located. That is approximately an 88-acre landfill that's located somewhat adjacent, but not necessarily directly contiguous to the transuranic storage area. And I think that's a key point, Your Honor, a point that you raised when you first began your questioning of the United States, and a point you've raised with me. Why didn't anybody use more specific language here? If the Department of Energy had intended only to apply to the 65,000 cubic meters of stored transuranic waste, which, again, the word stored is not in the agreement, why did they not say specifically the waste stored at the transuranic storage area? Why is the agreement written as broadly as it is to encompass all transuranic waste located in the entirety of the INEL, 900 approximately square miles of located area? Why did we use the words currently estimated? The currently estimated reflects the lack of certainty as to where on the INEL they were going to find transuranic waste, and it also reflects the temporal language of currently reflects at the time the uncertainty about what the total volumes of transuranic waste would be. The bottom line is if you look at the entirety of this agreement, and you look at all of the various clauses dealing with spent nuclear fuel, dealing with high-level waste, and dealing with transuranic waste, the clear intent of this agreement was to require the Department of Energy to remove all of the highly radioactive, dangerous materials that the United States has set by policy must go to deep geologic isolation, high-level waste, spent nuclear fuel, and transuranic waste. All of those are supposed to go into a deep geologic repository, and it was the goal of this agreement, the purpose and intent of this agreement, to have that waste addressed, to have that waste removed from Idaho, and sent to either the waste isolation pilot plant or wherever the ultimate spent nuclear fuel and high-level waste repository is sited. That was the purpose and intent, and if you read the agreement, and you read paragraph B1 consistently with that intent, you reach the conclusion that the state has done. In addition to which, we believe – And do you agree with the answer given by opposing counsel, that the consequence – let's say the United States has an obligation and decides not to fulfill it, the only consequence is that they can't bring more stuff in? Your Honor, that is the remedy that is available under the terms of the agreement. In addition, there are – we reserved for other types of issues, we reserved all of the equitable powers of the court, which is in one of the last provisions of the agreement, but with respect to this, the remedy would be stop shipments. So what would be there would stay there, but it wouldn't – the United States couldn't ship in more? They would be prohibited from shipping more. We would then, under the terms of the other agreement, we would obviously, as a state, argue to try and have the material removed under that agreement, under the 1991 Federal Facilities Agreement, the Corrective Action and CERCLA agreement, where the risk and costs of those types of activities are balanced for purposes of selecting a remedial alternative. Your Honor, the United States makes a big point about the term stored. They make a big point about the definition of transuranic waste changing. We believe that the record clearly supports the fact that the Department of Energy has used the word stored interchangeably. They have clearly made a distinction in their own documents between alpha low-level waste and transuranic waste. The evidence that they cite to say transuranic waste always met alpha low-level waste is the Environmental Impact Statement. If you look at the Environmental Impact Statement and the documents that are cited, the document – the EIS itself specifically says alpha low-level waste doesn't have a disposition path. If it was always their plan in 1995 to put this in and mix it all up and compact it and send it to WIPP, why does the EIS say we don't have a plan of what to do with this alpha low-level waste? We can't put it in the ground here at the INEL because it doesn't meet the waste acceptance criteria, which the EIS says, and it doesn't have a disposition path. So their own documents, if you want to go to the arguments about trade usage and establishing a common understanding, the very evidence that they rely upon shows that they themselves treated this issue differently. In addition to which, if the court is going to consider the entirety of that evidence, which obviously we moved to strike, the judge struck the evidence and did not consider it for purposes of the summary judgment, if the court is going to look at that evidence, then the court can equally look at the entirety of the evidence, and that includes the rebuttal evidence that the State offered. And it just is hard to believe that somebody could come to the court and say, well, this is what we always meant. Yes, we defined the term to say this, and we have a specific definition in the agreement, but we really meant something else, and what we meant was transuranic waste and alpha low-level waste. When in fact, when the State, during the negotiations, tried to get the Department of Energy to include the alpha low-level waste in the agreement, the Department of Energy repeatedly refused to include the alpha low-level waste as part of the agreement. Clearly, if you're talking about a common understanding of the parties as to the meaning of a term, how can the parties have a common understanding when one of the parties is directly, to the face of the other party, refuted what they're now claiming is the common understanding? For this reason, Your Honor, we believe that the evidence itself, even if it were considered, does not give rise to any ambiguity, and in fact, as the District Judge Lodge found, it was merely their attempt to split hairs over the meanings of the terms. Getting back to, I think, the other point that you raised, Your Honor, which is these were not just merchants and laypeople that negotiated this agreement. This agreement was negotiated at the very, very highest levels. If you look at who signed this agreement, Admiral Bruce DeMars of the Navy, the General Counsel for the Department of Energy, the General Counsel for the Navy, the Assistant Secretary for Environmental Management of the Department of Energy. You mentioned the drafting and negotiating. Who put this language together? Where are these people? Your Honor, the only person— Are they duly embarrassed? No, Your Honor. The only person actually that was involved in the drafting of the agreement that I'm aware of that is in the record in this case is Kathleen Trevor. Kathleen Trevor was a Deputy Attorney General. She was basically in my position at the time. She was tasked by the Attorney General to work on this agreement, and she, in fact, drafted and was involved in that. And that's the only testimony we have, as I understand it, from anybody directly involved in the drafting, and it's only her affidavit that appears in the record. Ms. Trevor is now the— What's the State's position? Yes, Your Honor. She filed an affidavit. She is now the head of the INEL Oversight Program for the State of Idaho. I think her official title is Coordinator of the INEL Oversight Program. She is one of my clients that I represent in my capacity as a Deputy Attorney General, and she is not here in the courtroom with me today, but she has been involved with this litigation ever since it started in 2002. Your Honor, one final point. The argument that the Department raises about G-1, if you look at G-1, G-1 on its face says nothing about the buried waste area. It says nothing about anything other than simply preserving the 1991 Federal Facility Agreement and requiring them to continue to work through that process. It does not act as they say it does to preclude the application of Paragraph B-1 to the buried waste area. It was simply a savings clause to prevent the Department from arguing that if they fulfilled their agreements under this agreement, they were done. They still had to go through the 1991 Federal Facility Process. Wouldn't this agreement represent a substantial modification of that 1991 agreement? No, Your Honor, because the agreements can be read consistently. The 1995 agreement is an agreement about removing waste from Idaho. The 1991 Federal Facility Agreement is about selecting and addressing a whole host of environmental problems at the INEL. The buried waste area is just the tip of the iceberg. It's one of our big, big problems out there, but we have all kinds of environmental problems at the facility that are being addressed through that. If the parties had intended G-1 to somehow act as a preclusive effect, they certainly could have chosen language that would have done that. They could have said, this addresses those obligations only. They didn't. Again, they could have said, if they only meant the transuranic storage area, they could have said the transuranic storage area, and they didn't do that. They said all transuranic waste located at the INEL. We respectfully request that you affirm the district court in this case. Thank you. With respect to the argument that all means all, it's not something that we dispute. All does mean all, but there is a question here, all of what? It's undisputed that there is a transuranic storage area. The word located, you didn't use the word stored. You'd have a better case if somebody had said stored. Correct. Located is a much broader term than stored. Right. And the state also argues that located means located, and they point to – Well, they pretty much are fond of all the plain meanings of all the terms. They have. I think – Your Honor, they have, but what they haven't done is read the agreement as a whole. Do you have anything from your negotiators? Do you have any affidavits or anything from your negotiators? Of what they intended it to mean? Well, we didn't submit anything in the – there's nothing in the record of that, Your Honor. Are they too embarrassed to let them – No, I don't think they're embarrassed either. They got snookered? No. But, Your Honor, the – Huh? Huh? Do they know who they are? Do they know who they are? Do you know who they are? No, at this point, no. Probably hiding. Your Honor, but let's talk about Kathleen and Trevor, then, because – I think you at least need that if you want to sort of establish some sort of non-meaning of the mind here. Well, there's – But don't you need at least negotiators to say, hey, when we said all, we meant some? Well, there's never been any dispute about what DOE's position about what the language has meant is. It's never represented – All it means is that that's what they hoped their contract would say. Right. They wind up with a contract that says something else, and they don't have anybody competent reading it, and they sign it anyway. Well – So, you know, the hopes and aspirations of DOE is not quite the same as saying, look, we negotiated this stuff, and here's how we use the language we did and what we think the language meant, which is what they have. You know, they actually have somebody who was there. Right, but Kathleen and Trevor – may I finish, Your Honor? You may. They have Kathleen and Trevor, who makes a bald assertion in the affidavit that there's approximately 65,000 cubic meters of stored and buried waste. She has no factual support for that. Furthermore, she testified before the state legislature and explained, she said, critics of this agreement are attacking it because it doesn't include buried waste. What they don't understand is that it's governed by a separate agreement, the 1991 Federal Facilities Agreement. Any evidence by Kathleen and Trevor in light of that statement of what she said before, it's not persuasive, Your Honor. DOE has submitted three statements. There's a fact sheet, a governor's state of the state address, and in testimony before a state legislature that the state understood within months of this settlement that it did not apply to the buried waste. Now, Mr. Early was up here and he said, if this decision doesn't stand, we'll have to try and get this waste removed under the other agreement, the 1991 Federal Facilities Agreement. Your Honors, that agreement is in process. It is working pursuant to SORCLA. There are statutory requirements there. This agreement does not cover the buried waste. It was never in anybody's contemplation. Mr. Early was also arguing up here that there are old statements about located and stored. Whatever old statements there were, the parties reached a resolution about the buried waste in 1991, and they have a separate agreement governing it. That, regrettably, again, the language is not as clear, but that is an indication of why it may not need to have been so clear, the parties thought, and wrongly so. They reached resolution about the buried waste in a separate agreement. The EIS was directed toward stored waste because SORCLA governed the buried waste, and this is what this litigation was a settlement of. The buried waste was not in the parties' contemplation. All of the evidence reflects that. You agree that this is the kind of thing that, if done by a lawyer in private practice on behalf of a client, would result in a malpractice lawsuit? Perhaps. Oh, yes, believe me. I have seen it. That's exactly what would happen. That's precisely what would happen. And is it one of those luxuries of working for the government that you don't even get identified as the person who dropped the ball? You know, here it is, you know, a multi-million, multi-billion dollar liability on behalf of the United States government, and we don't even know who the people are. Your Honor, unfortunately — Who can for this? Unfortunately, I don't know who is responsible for this language. And I don't know them. Negotiators? Have you tried talking to them? I mean, I don't quite understand how you can litigate this issue without talking to people who are on the scene. I mean, you want to make representations about what the United States meant, but you haven't even identified, you haven't even talked to the people who actually were on the ground negotiating this agreement. Correct. But there's no — Doesn't that strike you as bizarre? Well, Your Honor, I mean, it doesn't. I mean, what if you find them and they say, no, you know, you are wrong. We actually meant exactly what Idaho says. This is what we were instructed, and, you know, we thought that we did our job, and the reason we put the word all in there and the reason we put the word located rather than stored is because that's what we understood we were negotiating. What if they told you that? Well, Your Honor, I just don't think that's plausible. I mean, there's been no question — Counsel, I hate to tell you war stories, but the last time I saw an argument like this was in a case called the United States v. General Dynamics, a criminal prosecution against one of the major defense contractors, and the defense kept saying, look, why don't you talk to the people who negotiated the deal, your own people? They'll tell you that we did exactly what they thought we should do. The government went on. And after two years of litigation, the government conceded, having finally talked to their people, conceded, yep, you did it just right, General Dynamics, because we finally talked to our negotiators. And this sounds a lot like that. I don't think so, Your Honor, because the parties agreed in 1991 how to deal with the buried waste. I can't believe you're standing here on behalf of the United States and you haven't even talked to your negotiators. I just find this incomprehensible. It's not comprehensible that you are trying to persuade this Court of a position when you haven't even talked to the people on the ground who negotiated this agreement. You want to say, oh, this agreement is X, and this is what was in the heads of the people who were negotiating it, and you don't even know who they are. You haven't bothered finding them. Your Honor, I — What is it about the government that keeps you from doing what any client who has a problem like that, finds a problem like that that's been created by lawyers that were paid to negotiate, would go back to the lawyer and say, hey, what did you do to me? Well, respectfully, respectfully, Your Honor, the evidence that we have that's in the record is persuasive evidence of what the parties intended at the time — You don't think you need to bother to go and talk to the people who actually were on the ground and dealing with this thing and find out what it is they actually negotiated. You think that's something that you just don't need to bother to look at? Or are you afraid to look at it? No, I'm not afraid to look at it, Your Honor. I have the utmost confidence in the position that I am representing today of the Department of Energy, that this is what was intended at the — Two weeks. You find them, you talk to them. You understand? Yes. You find them, you talk to them, and then you let us know what they say. I will do my best. You will do it. Okay. Thank you, Your Honor. You understand? Yes. Okay. Submission is deferred for two weeks. You let us know one way or the other what you did. I will. Thank you. Thank you. Next case on the calendar, we have
judges: Kozinski, Fernandez, Clifton